## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT CORWIN,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>AMERPREET SAWHNEY,<br>JASWINDER CHADHA, JAMES GARVEY,<br>JEFFREY S. HEIER, RICHARD L.<br>LINDSTOM, W. JAMES O'SHEA, BRUCE<br>PEACOCK, CHARLES WARDEN, and<br>ERIC ANKERUD,<br><br>　　　　　Defendants,<br>　　and<br><br>OCULAR THERAPEUTIX, INC., a<br>Delaware Corporation,<br><br>　　　　　Nominal Defendant. | Case No.:  1:17-cv-11270<br><br><br>VERIFIED SHAREHOLDER'S<br>DERIVATIVE COMPLAINT |

Plaintiff Robert Corwin ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief after due investigation, as follows:

## NATURE OF THE ACTION

1.      Plaintiff Robert Corwin is a long-time shareholder of nominal defendant Ocular Therapeutix, Inc. ("Ocular" or "the Company"), which is engaged in the development of a number of pharmaceutical products for which it hopes to gain FDA approval.  The defendants named herein are the members of Ocular's Board of Directors (the "Board"), including Chief Executive Officer Amerpreet Sawhney ("Sawhney"), and one key executive (defendant Ankerud) who served as a corporate spokesman.  As further detailed herein, defendants Sawhney, Ankerud and the Company

have been accused in a securities fraud class action filed on July 7, 2017, entitled *Gallagher v. Ocular Therapeutix, Inc., et al.*, in the United States District Court, District of New Jersey, 17-cv-5011, with covering up serious manufacturing deficiencies which have repeatedly drawn negative attention from FDA inspectors. These deficiencies relate to Ocular's leading potential product DEXTENZA, which is designed for implantation in the eye following eye surgery (mainly cataract surgery) to reduce pain and swelling.  DEXTENZA is designed to provide up to a 30-day steroid dose post-surgery, which is in lieu of the use by the patient of steroid eye drops, which are difficult for many elderly patients to apply.  The individual defendants named in the class action are Amarpreet Sawhney, George Migausky, Andrew Hurley, and Eric Ankerud, (hereinafter the "Class Action Individual Defendants").

2.      Unfortunately, after a repeated FDA review of Ocular's manufacturing facilities, it has been found that Ocular has not remedied manufacturing defects.  In particular, the most recent review concerned, in part, contamination of DEXTENZA batches by aluminum particles.  The FDA has studied aluminum contamination, and has noted that exposure can led to toxic reactions, especially in persons with impaired kidney function, which is not an uncommon condition in the elderly.  Moreover, aluminum can cause a myriad of other ills, including central nervous system issues and bone toxicity

3.      Issues relating to Ocular's manufacturing processes first arose on July 25, 2016, when the Company received an FDA notice that its New Drug Application ("NDA") for DEXTENZA could be affected by "deficiencies in manufacturing process and controls identified during a pre-NDA approval inspection of the Ocular Therapeutix manufacturing facility." (Ocular press release dated July 25, 2016).  The Company noted that: "Satisfactory resolution of the

manufacturing deficiencies identified during the FDA facility inspection is required before the NDA may be approved."

4.      On January 23, 2017, Ocular resubmitted its NDA, and thereafter awaited word as to the scheduling of any FDA re-inspection.  That re-inspection occurred in late April and early May 2017, and the FDA's observations were recorded on its Form 483 (the "2017 Form 483"), a report utilized to list issues the inspector noted, and to outline the need for corrective action, if any. The 2017 Form 483 was delivered to the Company and its Board in or about early May 2017, but not otherwise made public (although, as discussed *infra,* it was obtainable via FOIA request, and analysts did later use the FOIA to obtain it in or about early July 2017).

5.      The assertions made in the 2017 Form 483 were alarming.  They included at the outset shipment for commercial use of contaminated product, without timely investigation of the cause, or corrective action:

> Specifically, Your firm ***failed to investigate the nature of particulate matter that has been found in manufactured drug product***. For example, Dextenza (Dexamethasone Punctum Plug 0.4mg) Lots…which had 224 plugs rejected due to an unknown particulate matter, which had 45 plugs rejected due to unknown particulate matter, and which had 37 plugs rejected due to unknown particulate matter, ***were released for intended commercial use on 12JAN2017 without an investigation or risk assessment on drug quality or product safety.*** Your firm initiated an investigation on 28APR2017 ***after product release*** when you noted that particulate matter in these lots appeared inclusive of aluminum.

6.      Other observations, more fully described *infra,* were just as troubling.  However, the Board permitted management to state the following without correction regarding the FDA report on Ocular's manufacturing processes:

> We were pleased during the re-inspection that the FDA investigator was able to confirm our corrective action plan from prior observations, and indicated that there was no further follow-up necessary to close out those issues. This was a new investigator, not the same investigator from prior inspections, and their primary focus in the 483 relates to a particulate

matter issue as part of our manufacturing process. The issue relates primarily to completion of an investigation that we have underway in regard to the particulate matter…***We feel quite comfortable that we have the situation under control….***

\*\*\*

I think there is [sic] two important issues to recognize. The first is that from the prior pre-approval inspection, FDA issued a 483. We resolve those issues, close[d] those issues with the district office and during this re-inspection the new investigator is responsible for confirming that we have implemented what was said in our responses. And the investigator went through each of our responses and confirm that we had properly and appropriately implemented those actions. ***So I think that's a strong sign that the manufacturing process has move forward significantly, and is in a fully developed mode***.

7.      The forgoing remarks were made on the May 5, 2017 public earnings call by Eric Ankerud, EVP, Regulatory, Quality, and Compliance, at the specific request of CEO Sawhney. As discussed below, they were not quite in accord with the FDA's findings.

8.      Ocular's directors have an on-going fiduciary duty to ensure that any statements regarding material issues such as this are accurate and complete, or that they are corrected if not accurate and complete. The Board members read the Form 483 and would have been able to immediately assess whether the statements above were accurate and complete.  Alternatively, if the Board members failed to read the Form 483, this would have been a bad faith complete abdication of their fiduciary duties.

9.      In or about early July 2017, analysts obtained the Form 483, and evaluated it with FDA experts. On July 6, 2017, an article by an analyst who obtained (and that day disclosed) the 2017 Form 483 was published on investor website Seeking Alpha.  In that article, entitled, "Ocular: A Poke in the Eye", the analyst stated in part that:

> -- Even a layperson reading this [Form 483] can tell that the company is having serious manufacturing issues, and their whole approach to manufacturing and patient safety is highly questionable. What's more troubling is that either management doesn't fully understand the letter, or they have been misleading investors. Both are bad.

-- OCUL has REPEAT observations. Not only did they not resolve prior issues, but have committed worse transgressions.

-- OCUL has characterized their manufacturing as "in a fully developed mode." Well, Observation 1 of the second 483 reads: "Particulate matter has been noted in 10/23 lots (intended use clinical, R&D, stability, etc.) manufactured from FEB2016 to date. The remaining [redacted] lots were scrapped prior to the visual inspection therefore their particulate status remains unknown." In plain English, this means that more than 50% of lots manufactured by OCUL contain bad product. That leaves plenty of room for additional development. Sometimes, OCUL has had to discard entire lots because they were out of spec!!

-- if OCUL only discarded bad product without investigation, that would be a bad thing. But in fact, they have been using bad product in clinical trials and have released some into their commercial supply!

10.    An additional article that day by analyst Adam Feuerstein made similar points.  In reaction to these revelations, Ocular shares dropped 25.05% on July 7, 2017 to $7.12 on extraordinary volume of 7.4 million shares.   This represents a loss in market value of approximately $70 million. On that same day, a securities fraud class action seeking damages against the Company and its top officers was initiated in the District of New Jersey.  The defined class period covers all purchasers of the Company's stock from May 5, 2017 to July 6, 2017.

11.    In response to these developments, CEO Sawhney, in an interview on July 7, 2017, stated that some of the issues raised by FDA about the DEXTENZA manufacturing and quality control process are taking more time to resolve. He also revealed that blades in a machine used to cut the solidified steroid into tiny implantable plugs was the source of the aluminum contamination.

12.    Ocular's public shareholders are not in charge of the Company's manufacturing processes, or in charge of ensuring the accuracy and completeness of its public statements.  That is the job of management and the Board.  These individuals should be held responsible for any damages they have caused, not the Company, and not its innocent shareholders.  Accordingly,

Plaintiff brings this action derivatively so that the Company may recover from these individuals for any costs, settlements or verdicts relating to the securities fraud class action, and for any other harms that have been caused to the Company through their wrongful actions or bad faith inaction.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C §1331 (federal question jurisdiction) insofar as this action arises under both section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

14.     Prior to Congress having enacted an express provision for contribution under section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to section 10(b) of the Exchange Act and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5. *See Musick, Peeler & Garnett v. Employers Ins. of Wausau*, 508 U.S. 286 (1993).  Thus, pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the federal contribution claim alleged herein.

15.     This Court also has subject matter jurisdiction over the pendent state law claims asserted herein pursuant to 28 U.S.C. §1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy.

16.     This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332 in that complete diversity exists between Plaintiff and each of the defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

17.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

18.     The Court has personal jurisdiction over each defendant because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because acts and offenses pertinent to the causes of action stated herein were committed in part in this jurisdiction.

## THE PARTIES

### Plaintiff

20.     Plaintiff Robert Corwin is a long-time Ocular shareholder, and has held Ocular shares continuously since October 2015.  Plaintiff Corwin is a citizen of New York.

### Defendants

21.     (a) Defendant Amarpreet Sawhney ("Sawhney"), on information and belief a citizen of Massachusetts, has served as the Company's President and Chief Executive Officer and as a member of its board of directors since 2006. He has served as the Chairman of the board of directors since June 2014. (b) Prior to the revelations of July 6, 2017, Sawhney was effectively fired by the Board from his CEO position.  This comes on the heels of the recent firings of the

Chief Financial Officer and the Chief Medical Officer.  In an SEC Form 8-K filed on June 22, 2017, the Company stated:

> On June 20, 2017, Ocular Therapeutix, Inc. (the "Company" or "Ocular Therapeutix") entered into an amendment to its employment agreement (the "Sawhney Amendment") with Amarpreet S. Sawhney, Ph.D., the Company's President and Chief Executive Officer ("CEO") and the Chairman of the Board of Directors of the Company (the "Board"), providing for Dr. Sawhney's transition to Executive Chairman of the Board.  The Sawhney Amendment amends Dr. Sawhney's existing amended and restated employment agreement with the Company, dated as of June 24, 2014.
>
> Pursuant to the Sawhney Amendment, Dr. Sawhney will continue to serve as President and CEO of the Company until September 18, 2017 or such other date on or prior to September 30, 2017 as a new CEO commences employment with the Company (the "Transition Date").  Effective on the Transition Date, Dr. Sawhney will be employed at-will to serve as the Executive Chairman of the Board and will no longer serve as President and CEO. The Board authorized and approved the Sawhney Amendment and the appointment of Dr. Sawhney as Executive Chairman on June 19, 2017.

22.     Defendant Jaswinder Chadha ("Chadha"), on information and belief a citizen of New Jersey and/or California, has served as a member of the Company's board of directors since 2013.

23.     Defendant James Garvey ("Garvey"), on information and belief a citizen of Massachusetts, has served as a member of the Company's board of directors since 2010.

24.     Defendant Jeffrey S. Heier, M.D. ("Heier"), on information and belief a citizen of Massachusetts, has served as a member of the Company's board of directors since 2015.

25.     Defendant Richard L. Lindstrom ("Lindstrom"), on information and belief a citizen of Minnesota, has served as a member of the Company's board of directors since 2012.

26.     Defendant W. James O'Shea ("O'Shea"), on information and belief a citizen of Massachusetts or New Jersey, has served as a member of the Company's board of directors since 2015.

27.     Defendant Bruce A. Peacock ("Peacock"), on information and belief a citizen of Pennsylvania, has served as a member of the Company's board of directors since 2014.

28.     Defendant Charles Warden ("Warden"), on information and belief a citizen of California, has served as a member of the Company's board of directors since 2008.

29.     Defendant Eric Ankerud ("Ankerud"), on information and belief a citizen of Massachusetts, has served as the Company's Executive Vice President, Regulatory, Quality and Compliance, since February 2016.  Previously, Mr. Ankerud served as Executive Vice President, Clinical, Regulatory and Quality from 2007 to January 2016.

30.     Defendants Garvey, O'Shea, Peacock and Warden serve on the Company's Audit Committee. The Audit Committee is in charge of monitoring and directing risk assessment and risk management, and "monitoring our internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics…"  Thus, the Audit Committee, and its members, have a heightened duty with regard to the issues raised herein, and are expected to discharge that duty with diligence and in good faith.

31.     Nominal defendant Ocular is a public company, incorporated in Delaware, and headquartered at 34 Crosby Drive, Ste. 105, Bedford, MA 01730-1449.

## **SUBSTANTIVE ALLEGATIONS**

### **Ocular's History and Business**

32.     Incorporated originally in 2006, and a public company since 2014, Ocular describes itself as

"a biopharmaceutical company focused on the development and commercialization of innovative therapies for diseases and conditions of the eye using our proprietary hydrogel platform technology. Our bioresorbable hydrogel-based drug product candidates are designed to provide extended delivery of therapeutic agents to the eye. Our lead product candidates are DEXTENZA (dexamethasone insert), for the treatment of post-surgical ocular inflammation and pain, allergic conjunctivitis and inflammatory dry eye disease, and OTX-TP, for the treatment of glaucoma and ocular hypertension, which are extended delivery, drug-eluting inserts that are placed into the canaliculus through a natural opening called the punctum located in the inner portion of the eyelid near the nose."

33.     Presently, Ocular's only commercial product is ReSure Sealant. ReSure is used as an alternative to suturing to seal surgical wounds from cataract surgery. It does not generate significant revenue.

34.     Ocular's highest hopes for the future rest on the approval and commercialization of DEXTENZA. This product is aimed primarily as a salve for inflammation and pain following cataract surgery. It is a long-term steroid implant to be used (if approved) in place of steroid eyedrops inserted by patents, who are sometimes non-complaint due to a variety of factors, including advanced age. DEXTENZA also has potential additional applications which are under study.

**FDA Approval Efforts and Inspections**

35.     Ocular has stated the following in SEC filings:

In September 2015, we submitted to the FDA a New Drug Application, or NDA, for DEXTENZA for the treatment of post-surgical ocular pain. On July 25, 2016, we announced that we had received a Complete Response Letter, or CRL, from the FDA regarding our NDA for DEXTENZA. On January 23, 2017, we announced that we had resubmitted our NDA. On February 22, 2017, we announced that the FDA accepted for review our NDA resubmission. The FDA determined that our NDA resubmission is a complete response and designated the NDA resubmission as a class 2, or major, review with a target action date under the Prescription Drug User Fee Act, or PDUFA, of July 19, 2017.

36.     The FDA will not approve DEXTENZA if it cannot be manufactured in accordance with current Good Manufacturing Practices (cGMP).  These practices require the product to be free of potentially toxic particulates.

37.     The FDA requires that:

> All articles intended for parenteral administration shall be prepared in a manner designed to exclude particulate matter…and other foreign matter. Each final container of all parenteral preparations shall be inspected to the extent possible for the presence of observable foreign and particulate matter (hereafter termed "visible particulates") in its contents.
>
> ***
>
> The inspection process shall be designed and qualified to ensure that every lot of parenteral preparations is essentially free from visible particulates. Qualification of the inspection process shall be performed with reference to particulates in the visible range of a type that might emanate from the manufacturing or filling process. Every container that shows evidence of visible particulates shall be rejected.

38.     The FDA does not, and will not, permit products for internal use to be contaminated by aluminum or other potentially toxic metals. Aluminum causes particular issues for persons with impaired kidney function, but even in healthier individuals effects have been noted on the central nervous system, digestive function, and iron metabolism.

39.     Issues relating to Ocular's manufacturing processes first arose on July 25, 2016, when the Company received an FDA notice that its New Drug Application ("NDA") for DEXTENZA could be affected by "deficiencies in manufacturing process and controls identified during a pre-NDA approval inspection of the Ocular Therapeutix manufacturing facility."  (Ocular press release dated July 25, 2016).  The Company noted that: "Satisfactory resolution of the manufacturing deficiencies identified during the FDA facility inspection is required before the NDA may be approved."

40.     On January 23, 2017, Ocular resubmitted its NDA, and thereafter awaited word as to the scheduling of any FDA re-inspection.  That re-inspection occurred in late April and early

May 2017, and the FDA's observations were recorded on its Form 483 (the "2017 Form 483"), a

report utilized to list issues the inspector noted, and to outline the need for corrective action, if any.

The 2017 Form 483 was delivered to the Company in or about early May 2017, but not otherwise

made public.  The 2017 Form 483 it was obtainable via FOIA request and, as noted, analysts did

later use the FOIA to obtain it in or about early July 2017.

41.     The assertions made in the 2017 Form 483 were alarming.  They noted at the outset

shipment for commercial use of contaminated product, without timely investigation of the cause,

or corrective action:

> Specifically, Your firm **failed to investigate the nature of particulate**
> **matter that has been found in manufactured drug product**. For example,
> Dextenza (Dexamethasone Punctum Plug 0.4mg) Lots…which had 224
> plugs rejected due to an unknown particulate matter, which had 45 plugs
> rejected due to unknown particulate matter, and which had 37 plugs
> rejected due to unknown particulate matter, **were released for intended**
> **commercial use on 12JAN2017 without an investigation or risk**
> **assessment on drug quality or product safety.** Your firm initiated an
> investigation on 28APR2017 after product release when you noted that
> particulate matter in these lots appeared inclusive of aluminum.
> ***
> Specifically, **your sampling plan supporting product release and stability**
> **testing is not designed to assure that samples are representative of the**
> **entire subject lot or unit to be tested**. Your procedure SOP 1004, Revision:
> C, Release of Drug Products, states that product sampling for LAL testing
> "should result in a random sampling of a finished production lot" and
> product sampling for performance testing is non-specific regarding the
> sampling technique. Your procedure does not include any explanation of
> sampling techniques or sampling distribution assured to obtain
> representative samples. **Additionally, there were no documented sample**
> **records**….

42.     Other observations were just as troubling.   However, the Board permitted

management to state the following without correction regarding the FDA report, and Ocular's

manufacturing processes:

> We were pleased during the re-inspection that the FDA investigator was
> able to confirm our corrective action plan from prior observations, and

indicated that there was no further follow-up necessary to close out those issues. This was a new investigator not the same investigator from prior inspections, and their primary focus in the 483 relates to a particular matter issue as part of our manufacturing process. The issue relates primarily to completion of an investigation that we have underway in regard to the particular matter solidifying specifications for in process, 100% visual inspection of our inserts, as well as enhancing our operator training. *We feel quite comfortable that we have the situation under control….*
\*\*\*
I think there is two important issues to recognize. The first is that from the prior preapproval inspection, FDA issued a 483. We resolve those issues, close those issues with the district office and during this re-inspection the new investigator is responsible for confirming that we have implemented what was said in our responses. And the investigator went through each of our responses and confirm that we had properly and appropriately implemented those actions. *So I think that's a strong sign that the manufacturing process has move forward significantly, and is in a fully developed mode*.

43.　　The foregoing remarks were made on the May 5, 2017 public earnings call by Eric Ankerud, EVP, Regulatory, Quality, and Compliance, at the specific request of CEO Sawhney.

44.　　Ocular's directors have an on-going fiduciary duty to ensure that any statements regarding material issues such as this are accurate and complete, or that they are corrected if not accurate and complete. The Board members read the 2017 Form 483 and would have been able to immediately assess whether the statements above were accurate and complete. Alternatively, if the Board members failed to read the 2017 Form 483, this would have been a bad faith complete abdication of their fiduciary duties.

45.　　In or about early July 2017, analysts obtained the Form 483, and evaluated it with FDA experts. On July 6, 2017, an article by an analyst who obtained (and that day disclosed) the 2017 Form 483 was published on investor website Seeking Alpha.  In that article, entitled, "Ocular; A poke in the Eye", the analyst stated in part that:

-- Even a layperson reading this can tell that the company is having serious manufacturing issues, and their whole approach to manufacturing and patient

safety is highly questionable. What's more troubling is that either management doesn't fully understand the letter, or they have been misleading investors. Both are bad.

-- OCUL has REPEAT observations. Not only did they not resolve prior issues, but have committed worse transgressions.

-- OCUL has characterized their manufacturing as "in a fully developed mode." Well, Observation 1 of the second 483 reads: "Particulate matter has been noted in 10/23 lots (intended use clinical, R&D, stability, etc.) manufactured from FEB2016 to date. The remaining [redacted] lots were scrapped prior to the visual inspection therefore their particulate status remains unknown." In plain English, this means that more than 50% of lots manufactured by OCUL contain bad product. That leaves plenty of room for additional development. Sometimes, OCUL has had to discard entire lots because they were out of spec!!

-- if OCUL only discarded bad product without investigation, that would be a bad thing. But in fact, they have been using bad product in clinical trials and have released some into their commercial supply!

46.     An additional article that day by analyst Adam Feuerstein made similar points.  In reaction to these revelations, Ocular shares dropped 25.05% on July 7, 2017 to $7.12 on extraordinary volume of 7.4 million shares.   This represents a loss in market value of approximately $70 million. On that same day, a securities fraud class action seeking damages against the Company and its top officers was initiated in the District of New Jersey. The defined class period covers all purchasers of the Company's stock from May 5, 2017 to July 6, 2017.

47.     In response to these developments, CEO Sawhney, in an interview on July 7, 2017, stated that some of the issues raised by FDA about the DEXTENZA manufacturing and quality control process are taking more time to resolve. He also revealed that blades in a machine used to cut the solidified steroid into tiny implantable plugs was the source of the aluminum contamination.

## DERIVATIVE DEMAND ALLEGATIONS

**The Board Was on Notice of Serious Manufacturing Issues**

48.     During the initial inspection in 2016 (the "2016 Form 483"), the FDA noted serious manufacturing issues.

49.     Among the 2016 observations were the following which, despite being crucial to approval, had not been remedied by mid-2017:

> (a) Specifically, your sampling plan supporting product release and stability testing ***is not designed to assure that samples are representative of the entire subject lot or unit to be tested.*** Your procedure SOP 1004, Revision: C, Release of Drug Products, states that product sampling for LAL testing "should result in a random sampling of a finished production lot" and product sampling for performance testing is non-specific regarding the sampling technique. ***Your procedure does not include any explanation of sampling techniques or sampling distribution to assure representative samples. Additionally, there were no documented sample records...***showing the sampling distribution...and that sampling was representative of the complete lots to support data submitted in the NDA.

> (b) Control procedures are not established which monitor the output and validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product.

50.     The Board either knew of these issues and the long-term failure to address them or, if it did not know, in was in bad faith violation of its duties, as such ignorance would constitute an utter failure to discharge their fiduciary duties.

51.     Likewise, the Board either knew of the issues cited in the 2017 Form 483 and the long-term failure to address them or, if it did not know, in was in bad faith violation of its duty, as such ignorance would constitute an utter failure to discharge their fiduciary duties.

**The Board Permitted the Regulatory Failures to Be Misrepresented**

52.     The Board, having access to the 2017 Form 483 that the public did not, knew that

management had misinformed the public in stating on May 5, 2017:

> We were pleased during the re-inspection that the FDA investigator was
> able to confirm our corrective action plan from prior observations, and
> indicated that there was no further follow-up necessary to close out those
> issues. This was a new investigator not the same investigator from prior
> inspections, and their primary focus in the 483 relates to a [particulate]
> matter issue as part of our manufacturing process. The issue relates
> primarily to completion of an investigation that we have underway in
> regard to the particular matter solidifying specifications for in process,
> 100% visual inspection of our inserts, as well as enhancing our operator
> training. ***We feel quite comfortable that we have the situation under
> control….***
>
> ***
>
> I think there is two important issues to recognize. The first is that from the
> prior preapproval inspection, FDA issued a 483. We resolve those issues,
> close those issues with the district office and during this re-inspection the
> new investigator is responsible for confirming that we have implemented
> what was said in our responses. And the investigator went through each of
> our responses and confirm that we had properly and appropriately
> implemented those actions. ***So I think that's a strong sign that the
> manufacturing process has move forward significantly, and is in a fully
> developed mode***.

53.     Manufacturing was not in a "fully developed mode", as almost half the sample

batches were contaminated, and the others were inexplicably discarded before they could be

reviewed.  Contaminated product was shipped, and only investigated post-shipment when notice

of aluminum contamination was received.  There was no adequate sampling plan; no explanation

of sampling techniques; and no control procedures to validate the purity of the product.

54.     It cannot have been a valid exercise of business judgment to either allow these

conditions to persist, or to permit gross misrepresentations of the situation to be made on public

conference calls without correction.

55.     Prior to the revelations of July 2017, the Board took action to remove from their positions the CEO and the Chief Medical Officer, creating an inference that it knew of substantial, undisclosed problems.

56.     Each member of the Board, due to the actions and inactions detailed above, faces a substantial likelihood of liability, as each member's conduct was in bad faith.  In addition, five members of the Board, consisting of the CEO and the four Audit Committee members had a special duty to take action, as they specifically were in charge of appropriate risk management and appropriate disclosure.

57.     Moreover, as the Company now faces securities fraud liability, the Board members are disabled from bringing this action, and making the allegations herein.

58.     In light of the above, demand is excused as futile.

## COUNT I

**(Derivatively Against All Defendants for Contribution Under the Exchange Act and Against the Class Action Individual Defendants Under Sections 10(b) and 21D of the Exchange Act)**

59.     Plaintiff repeats and realleges all previous allegations set forth above, as though fully set forth herein.

60.     The individual Defendants, as directors and as members of the Audit Committee, officers, and otherwise, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements about Ocular and had the power and/or ability directly or indirectly to control or influence defendants Sawhney and Ankerud ("the Class Action Individual Defendants") in connection with the specific corporate policies and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

61.     In addition, the Class Action Individual Defendants are liable under 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

## COUNT II

**(Against the Individual Defendants for Breach of Fiduciary Duty)**

62.     Plaintiff repeats and realleges all previous allegations set forth above, as though fully set forth herein.

63.     As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of Ocular and because of their ability to control the business and corporate affairs of Ocular, owed the Company fiduciary obligations of due care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage Ocular in a fair, just, honest, and equitable manner.

64.     The Individual Defendants failed to ensure through the Relevant Period that Ocular was in compliance with all applicable laws needed to protect the health and welfare of the public, and provide accurate and complete disclosure under the federal securities law.  In fact, the Individual Defendants permitted reassuring statements to be made even after it became clear that Ocular was in violation of its legal obligations; had not addressed fully and completely all of its compliance issues; and lacked appropriate written procedures needed to comply with the law. Accordingly, the Individual Defendants breached their duty of loyalty to the Company, and did so in bad faith.

65.     The individual Defendants owed Ocular the highest duty of loyalty, and breached this duty when they made or permitted improper statements regarding the nature of Ocular's manufacturing challenges.

66.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, and will suffer more, as alleged herein.   Market value has substantially decreased, and Ocular will face substantial challenges raising needed funds, resulting in higher interest rates, or sale of shares at lower prices, causing dilution.   Such damages may be recovered derivatively for the benefit of Ocular.

67.     Plaintiffs, on behalf of Ocular, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Declaring that the Class Action Individual Defendants are liable under section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and that the Director Defendants are jointly and severally liable under section 20(a) of the Exchange Act, and awarding Ocular damages on these counts;

C.     Directing Ocular and the Board to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ocular and its shareholders from a repeat of the damaging events described herein, including

1.     new measures to strengthen the Board's supervision of operations and development and implementation procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Ocular to nominate at least three candidates for election to the Board;

3.     methods to ensure the establishment, maintenance, and internal controls of the Company's compliance with applicable federal and state laws and regulations concerning the manufacture of its products;

4.     formation of a committee with the sole goal of assuring compliance with cGMP; and

5.     methods to strengthen the Company's controls over the accuracy of its public disclosures;

D.     Awarding to Ocular restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

F.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Respectfully submitted,

/s/ Mitchell J. Matorin
Mitchell J. Matorin (BBO# 649304)
Matorin Law Office, LLC
18 Grove Street, Suite 5
Wellesley, MA 02482
(781) 453-0100
mmatorin@matorinlaw.com

**Of Counsel:**

Laurence D. Paskowitz
**THE PASKOWITZ LAW FIRM P.C.**
208 East 51st Street, Suite 380

New York, New York 10022
212- 685-0969
212-685-2306 (fax)
lpaskowitz@pasklaw.com

Roy L. Jacobs
**ROY JACOBS & ASSOCIATES**
420 Lexington Avenue, Suite 2440
New York, NY 10170
212- 867-1156
212-504-8343 (Fax)
rjacobs@jacobsclasslaw.com